# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | | |
|---|---|---|
| Iris Negron, | : | Case No. 1:09CV0691 |
| | : | |
| Plaintiff | : | Judge Patricia A. Gaughan |
| | : | |
| v. | : | Magistrate Judge David S. Perelman |
| | : | |
| Commissioner of Social Security, | : | **REPORT AND RECOMMENDED** |
| | : | **DECISION** |
| Defendant | : | |

This action pursuant to 42 U.S.C. §§405(g) and 1383(c)(3) seeking judicial review of defendant's final determination denying plaintiff's claims for disability benefits, (DIB), 42 U.S.C. §§416, 423 and supplemental security income benefits (SSI), 42 U.S.C. §1381 et seq., is pending decision upon the parties' submissions on the merits, pursuant to which plaintiff seeks entry of final judgment in her favor, alternatively, an order of remand, and defendant seeks final judgment upholding the decision below.

Plaintiff's right to benefits under both programs is dependent upon a showing that she is disabled, as that term is defined in the Social Security Act.  Disability is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for not less than 12 months." 42 U.S.C. §§423(d)(1), 1383c(a).  The programs differ with regard to other qualifying criteria.  The disability benefits statute requires "fully insured" status, which focuses on the period of time the claimant has worked while covered by Social Security.  The SSI

program focuses on income and resources as basic eligibility factors.

Plaintiff's applications were filed on October 12, 2004,[1] alleging an onset date of January 1, 1993.[2]

Upon denial of plaintiff's claims on the state agency level hearing de novo before an Administrative Law Judge (hereinafter ALJ) was requested. Evidentiary hearing, at which plaintiff was represented by counsel, was held on July 25, 2008. Also testifying at that proceeding were a medical expert, Dr. Robert Newman, and a vocational expert, Mr. Thomas Nimberger.

At the outset of the hearing counsel, after conferring with the plaintiff, moved to amend the plaintiff's onset date to October 12, 2004. The reason for the amendment was that the plaintiff had been working at "a little mini store on the corner by where I live"[3] for four or five months preceding the hearing.

In her testimony the plaintiff maintained that she suffers from fibromyalgia, and that the pain from that disorder increased to the point where she could no longer work.[4] She alleged that she suffers from pain throughout her body, and essentially describes herself as a helpless individual.

---

[1] Notwithstanding the certification "that the documents annexed hereto constitute a full and accurate transcript of the entire record of proceedings relating to the case," only the DIB application is in the transcript. Also missing is the Disability Report - Adult form which is normally completed along with the application(s), which calls for a statement of the alleged disabling impairments and the manner in which they limit the claimant's ability to work.

[2] The transcript also contains a DIB application dated September 20, 2002, which alleged an onset date of December 2, 2001. That application was accompanied by a Disability Report - Adult in which the alleged disabling impairments were stated as "I have back pain, going down my legs, muscle spasms and pinched nerves. My legs go numb" and the manner in which they limited the plaintiff as "I have trouble standing and walking." While that application apparently ended with denial at the state agency level which could present res judicata considerations as regards the 2004 applications there is no mention thereof in the decision of the Administrative Law Judge or the briefs of either party, which this Court considers to represent shoddy work on all their parts.

[3] She stated she worked four hours a day, four or five days a week.

[4] She also testified that while she was working on many weeks she was only able to work two days a week because "I couldn't get up from the bed."

She stated that her husband and twelve year old daughter basically did the household chores; that her husband takes the daughter to school; that she cannot walk any distance; that she only shops with the assistance of her husband and daughter; that she only leaves the house to go visit a friend who picks her up, to go to doctor's appointments and to go to church; that she only sleeps a couple hours a night and will nap two or three times during the day; and that she has had to discontinue some medical treatment because she has no money an no insurance.[5]  She also stated that she suffers from pain in her back, swelling in her legs, ankles, knees, elbows, hands and fingers, which comes and goes.

Dr. Newman accepted the fact that the plaintiff suffers from fibromyalgia, and stated that she would have frequent episodes of fatigue, would be unable to sit for long periods of time, and a later point in his testimony indicated that the plaintiff's complaints of swelling in the various parts of her body were quite compatible with that disorder.

When questioned by the ALJ he at first stated that "I think really that she has some impairment as to her ability to work and it becomes a question of trying to find how much, how severe that is" which was followed by:

> Q. Do you have an opinion regarding how much she would be able to lift and carry?
>
> A. I would think she would be able to lift and carry at least 20 pounds.
>
> Q. Okay.  So are you telling me that just looking at the objective evidence then there is a question as to whether or not she would be able to work a full eight hour workday?
>
> A. Yes.

---

[5]She apparently had had Medicaid coverage which terminated.

Q. And that would depend basically upon her, her symptoms?

A. Yes, sir.

\* \* \*

Q. Okay. So, Doctor, just to be clear, I didn't hear you opine that she's unable to work eight hours.

A. No, I did not say that. I said that, what I mean to say she's able to work eight hours but there are many qualifications as to how well she's going to be able to do it. Whether it's six hours or eight hours, I can't really say.

ALJ: Okay. Thank you. Counsel, I'm interpreting the doctor's opinion as being, this case really depends upon the credibility of your client with regard to her symptoms. That's how I'm viewing it. I'm not hearing an objective opinion from the doctor that based on the—

ATTY: One way or the other.

ALJ: —objective evidence in the, in the record that that alone would, would show that your client is unable to sustain an eight hour work day. I think we're really looking at the credibility of your client now regarding her, her symptoms.

EXAMINATION OF MEDICAL EXPERT BY ATTORNEY;

Q. Okay. It's a little confusing. I appreciate your explanation of it. It seems as though we're dealing, I appreciate your explanation too regarding the nature of the condition. And from what you've said is that we're not going to have any objective testing necessarily that's going to show that this condition exists. But we do have, is this, let me ask it a different way. Is this condition typically treated by rheumatologists as an appropriate physician?

A. They eventually wind up with rheumatologists although they're usually turned back to their primary care doctors.

Q. Okay. And we do have, at least it seems we have some early diagnosis of the fibromyalgia, I guess with 25F, page 26, and you don't have to look at that particular place, but

        it says multiple tender points on exam and at the fibromyalgia distribution.  <u>Do you accept the appropriateness of, of this condition that she does in fact suffer from fibromyalgia given the evaluation?</u>

A.    <u>Yes, I think she does.</u>

Q.    Okay.  And—

A.    I might say—

Q.    Sure.

A.    —if I can.

Q.    Sure.

A.    She may, she has, I'm pretty sure she can work an eight hour day but <u>there are going to be lots of times when there's going to be absences or time when she can't do it.</u>

Q.    Okay.

A.    So most of the time she's going to be able to work an eight hour day.

Q.    So it's going, it's going to vary to some extent?

A.    It's going to vary and I can't give you an exact frequency.

Q.    Let me ask you, and I appreciate this.  It is somewhat of a subjective thing.  <u>Is it reasonable to conclude that this condition would result in her being absent two day a month?</u>

A.    <u>Two days a month, yes, I would think so.</u>

Q.    Is it reasonable to, based on what you've read and as far as the symptoms you've seen of her dizziness and fatigue and pain and so forth, and you mentioned as well, that she would have frequent episodes of being unable to sit for long, for long periods of time, et cetera.  I argue to the Judge that there would be an issue of sustainability and you commented upon it.  Is it also reasonable to conclude that

    these symptoms would result in her being off task a certain amount of time per hour when she is working?

A.     I don't think, I don't think I could really tell you on that.

Q.     Okay.

A.     The one thing I would say is this is a condition which is not necessarily going to get worse. She's not going to be, she's not going to die of fibromyalgia. She should take good care of her health as well as most of us can but she will have these symptoms which will come and go.

Q.     Okay. And I guess this is a final question, in your opinion, Doctor, there are situations in which fibromyalgia can be severe enough when, by itself, it is disabling? We don't know, in your opinion, you're not really commenting with this but in general?

A     Right.

            \*   \*   \*

RE-EXAMINATION OF MEDICAL EXPERT BY ATTORNEY:

Q.     I just wanted to touch upon on, or follow up on a couple of things, Doctor. She mentioned that she's got pain in her back and in her legs as well. Is, is what she has described as far as the location, is that also consistent with the pattern of the distribution of fibromyalgia pain?

A.     Not particularly.

Q.     Okay. How so?

A.     It could be, it could be a person who has osteoarthritis or some, of course, she's young for that.

Q.     Okay. So what she's described as far as her pain in her back is inconsistent with fibromyalgia?

A.     It could be. It could go along with fibromyalgia.

Q.     It could go along?

6

    A.    Yes, yes.

    Q.    Okay. And of course, you're not going to have necessarily a degenerative impairment along with that?

    A.    No, but you might find for it, in a younger person, some congenital abnormalities that would make you think that there would be more severe.

    Q.    And since you mentioned it at the start of the testimony today, you said it would depend on what she's, what she said and so forth. <u>In your opinion, doctor, has her testimony today been consistent with what you've read as far as the medical evidence is concerned?</u>

    A.    Yes.

RE-EXAMINATION OF MEDICAL EXPERT BY ADMINISTRATIVE LAW JUDGE:

    Q.    Okay. <u>Doctor, I thought earlier in your testimony, one of the things you told me was that she might be able to work for six to eight hours; however she may have times where she's unable to perform such work during the month, is that—</u>

    A.    <u>Yes, that's true.</u>

    Q.    <u>—what I understood your testimony to be?</u>

    A.    <u>Yes.</u>

    Q.    And what I heard from the claimant is that, that her pain is so bad and so persistent that she's unable to leave her house and go shopping by herself for even one or two hours at a time and that that, that's a circumstance that, that is there every day. From objective medical standpoint, is that reasonable based on her fibromyalgia?

7

      A.      I'd say it's not reasonable.[6]

(Emphasis added.)

Of critical importance to this Court is the following from the testimony of the vocational expert:

      Q.      [ATTY]. . .One final question, the medical expert testified that it would be reasonable based on the conditions that she suffers from that she would be expected to miss at least two days every month of work. Is that consistent with competitive employment?

      A.      No, it's not. It's an employability question. They could be hired, but they couldn't last. If they knew it up front, the couldn't be hired.

On August 13, 2008 the ALJ entered his opinion denying plaintiff's claims. That decision became defendant's final determination upon denial of review by the Appeals Council on January 29, 2009. The ALJ's "Findings of Fact and Conclusions of Law" were:

    1.    The claimant met the insured status requirements of the Social Security Act through December 31, 2006.

    2.    The claimant has not engaged in substantial gainful activity since October 12, 2004, the amended alleged onset date (20 CFR 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).

    3.    The claimant has the following severe impairments: fibromyalgia, depressive disorder, and generalized anxiety disorder (20 CFR 404.1520(c) and 416.920(c)).

    4.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 910 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

---

[6]This Court has a very difficult time in reconciling the doctor's "Yes" response to counsel's question whether the plaintiff's testimony was consistent with the medical literature regarding fibromyalgia with his statement almost immediately thereafter that the plaintiff's pain complaints were not reasonable based upon her fibromyalgia.

5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that she can only lift/carry 10 pounds occasionally and 5 pounds frequently.  She can stand/walk 6 hours during an 8-hour workday.  She can sit for 6 hours.  She can occasionally climb ramps/stairs, but no ladders, ropes, or scaffolds.  She can only occasionally stoop.  She can frequently reach, handle and do occasional fingering.  She must avoid exposure to extreme heat and cold.  She must avoid exposure to wetness and humidity.  She can only do occasional pushing and pulling.  She can only understand, remember and carry out simple instructions.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on March 3, 1978 and was 26 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled,' whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

11. The claimant has not been under a disability, as defined in the Social Security Act, from October 12, 2004 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Before addressing the claims of error raised on behalf of the plaintiff, there is a matter not presented by plaintiff's counsel which this Court cannot ignore, that being that the ALJ's Finding No. 5 makes no sense.  His determination that the plaintiff can "perform light work as defined in 20

9

CFR 404.1567(b)" is completely at odds with his further determination that she can do so "except that she can only lift/carry 10 pounds occasionally and 5 pounds frequently." As defined in the regulations cited by the ALJ a person must be able to lift objects of up to twenty pounds and frequently lift/carry weights up to ten pounds in order to do light work. An individual who is limited to lifting/carrying ten pounds occasionally and five pounds frequently is considered as restricted to sedentary work. See, 404.1567(a) and 416.967(a).[7]

On this appeal the claims of error raised by the plaintiff are:

I. The ALJ erred in failing to accord controlling weight to the treating physicians' opinion(s) that Ms. Negron suffers from fibromyalgia, and can not work because of severe pain.

   A. Appropriate standards were not utilized in evaluating plaintiff's disability.

   B. The opinions of plaintiff's treating physicians deserve controlling weight and establish disability.

II. The ALJ committed substantial error by wrongfully finding Ms. Negron's testimony not credible.

III. The ALJ committed serious error in failing to find Ms. Negron's pain disabling.

While articulated differently, each of those implicates the ALJ's assessment of the plaintiff's credibility and the weight given the medical evidence in light thereof.

This Court has great difficulty with the ALJ's rationale for discounting the plaintiff's testimony.

He stated:

---

[7] As it happens, this obvious error would fall into the harmless error category, as several of the jobs the ALJ found the plaintiff capable of performing, set out in the body of his decision, were identified by the vocational expert as being at the sedentary level.

> Specifically, the overall record does not support that Ms. Negron's severe impairments are disabling at any time through the date of this decision. For instance, primary care physician Dr. Sonia Tanio, who began treating Ms. Negron in October 2004, notes that though she complains of pain in her joints due to fibromyalgia, her gait is within normal limits and there are no medically necessary walking aids. She used a TENS unit, Naproxen and Trazadone and visited a chiropractor, but her prognosis is fair and her symptoms are controlled with treatment (Exhibit 8F/4).
>
> Despite noting that Ms. Negron's symptoms are well-controlled with medication, Dr. Tanio reported that she could not perform more than a limited range of work at the sedentary level of exertion. Specifically, she states that Ms. Negron could only lift/carry less than 5 pounds, stand/walk 30 minutes at a time for up to one hour, and sit for a total of 30 minutes (Exhibit 10F). Obviously, that statement is not consistent with Dr. Tanio's own assessment of Ms. Negron's medical condition; indeed, if she were this limited in her physical capacity, her symptoms are not, as Dr. Tanio notes, "well-controlled on medication." Consequently, I cannot afford controlling or even some weight to this medical opinion, even though it comes from a treating source.

There are, in this Court's opinion, several problems with the foregoing.

First, there is no medical evidence that a person suffering from fibromyalgia would have an abnormal gait or require walking aids.

Next, and more important, the ALJ transformed the doctor's statement in her report "Response to treatment: symptoms controlled with treatment" to "Ms. Negron's symptoms are well-controlled with medication." There is, in this Court's opinion, a world of difference between symptoms being controlled with treatment and symptoms being well-controlled with medication.

Most importantly is that in the same report from which the ALJ selectively excerpted this one phrase the doctor reported that the plaintiff complained of "back pain, muscular pain, aches all over the body, legs extremities," that "patient symptoms are consistent with objective findings" and that the primary diagnosis was fibromyalgia.

11

In the Medical Source Statement - Patient's Physical Capacity form completed by Dr. Tanio, which the ALJ discounted as "not consistent with Dr. Tanio's own assessment of Ms. Negron's medical condition" (repeating the erroneous statement that Dr. Tanio had noted that the plaintiff's symptoms were "well-controlled on medication), the treating physician reported that her patient "developed pain lower back, knee and fingers" and evaluated the plaintiff's functional capacity below the sedentary level.

The ALJ also observed as a negative factor that "The record does not reveal any treatment for fibromyalgia since December 2006." While that may be so, the plaintiff explained that the absence of treatment was by reason of her inability to pay for such medical service.[8]

The ALJ also discounted the plaintiff's claim of disability because "as Ms. Negron testified, her condition has been present since her teenage years; yet, she has been able to work at an SGA level in spite of this alleged ongoing problem." This ignores the plaintiff's testimony that the pain and limitations secondary to her fibromyalgia had increased over the years until she had to stop working.

The Sixth Circuit long ago recognized that fibromyalgia can be a disabling impairment, even though there may be no objective medical signs which can be pointed to. <u>Preston v. Secretary of Health and Human Services</u>, 854 F.2d 815, 820 (6th Cir. 1988). As Magistrate Judge Baughman of this Court has observed "Fibromyalgia is an 'elusive' and 'mysterious' disease. It has no known cause and no known cure" (footnotes omitted). <u>Swain v. Commissioner of Social Security</u>, 297 F.Supp. 2d 986, 990 (N.D. Oh. 2003).

The inescapable fact is that every medical professional who has considered the plaintiff's

---

[8] Almost all of the medical evidence post-dating 2006 is related to emergency room admissions for medical problems other than the plaintiff's fibromyalgia.

12

case, including her treating physicians Drs. Tanio and Zein, a state agency reviewing physician (R. 281),[9] and Dr. Newman all accepted that the plaintiff's pain complaints are consistent with fibromyalgia.  The Sixth Circuit has recently stated that while it is the function of the ALJ to weigh the medical evidence "Nonetheless, an 'ALJ may not substitute his own medical judgment for that of the treating physician where the opinion of the treating physician is supported by medical evidence.' Meece v. Barnhart, 192 F.App'x 456, 465 (6th Cir. 2006); see also Rohan v. Chater, 98 F.3d 966, 970 (7th Cir. 1996) (stating 'ALJ's must not succumb to the temptation to play doctor and make their own independent medical findings')." Simpson v. Commissioner of Social Security, (6th Cir. No. 08-3651, 8/27/2009), slip opinion p. 24.

In this case not only did the ALJ violate the treating physician rule by substituting his opinion for that of Dr. Tanio as regards the impact of the plaintiff's fibromyalgia upon her functional capacity, he also ignored Dr. Newman's statements that the plaintiff's testimony was "consistent with what you've read as far as the medical evidence is concerned," that by reason of her fibromyalgia "there are going to be lots of times when there's going to be absences [from work] or times when she can't do it," and that it would be "reasonable to conclude that this condition would result in her being absent two days a month," which the vocational expert testified would render the plaintiff unemployable.

Based upon all the foregoing, it is recommended that the defendant's final determination be reversed and final judgment entered in the plaintiff's favor finding that she is entitled to an award of DIB based upon her amended onset date of October 12, 2004 and to an award of SSI for the period after that date as she meets the economic criteria for such benefits.

---

[9] The state agency physician, while concluding that the plaintiff could perform light work, stated that "Her pain is well documented and limits her ability to do physical tasks."

                                              s/DAVID S. PERELMAN
                                              United States Magistrate Judge

DATE:    August 19, 2010

## OBJECTIONS

Any objections to this Report and Recommended Decision must be filed with the Clerk of Courts within fourteen (14) days of receipt of this notice. Failure to file objections within the specified time waives the right to appeal the District Court's order. *See, United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See, also, Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).